# EXHIBIT 1



**MASTER SERVICES AGREEMENT Between AV Solutions, LLC**

**And KEYSTONE ENTERPRISE SERVICES**

THIS AGREEMENT is made and entered into this 1st day of March, 2009 ("Effective Date"), by and between **AV Solutions, LLC,** (CUSTOMER), a New Jersey limited liability company, and **Keystone Enterprise Services LLC,** doing business as GlobeCast Enterprise Services, a Utah corporation ("CONTRACTOR").

WHEREAS, CUSTOMER wishes to obtain from CONTRACTOR rights to use certain satellite communications products, including software and hardware developed and manufactured by third parties, as well as direct services from CONTRACTOR, in exchange for CUSTOMER making certain stipulated payments directly to CONTRACTOR; and

WHEREAS, the Parties desire that the CONTRACTOR be engaged by CUSTOMER to perform services in accordance with the provisions hereof; and

WHEREAS, the CONTRACTOR represents that it has the requisite personnel, competence and legal right to perform such services.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and intending to be legally bound, the Parties covenant and agree as follows:

## I. DEFINITIONS

As used in this Agreement, the following words and phrases shall have the following meanings. All words and phrases defined in this Section I. shall appear in initial capital letters throughout this Agreement indicating that each has a special meaning defined herein.

A.      "Day" or "day" refers to a 24-hour period from midnight to midnight. All reference shall be to a calendar day, not a workday.

B.      "Pricing" shall refer to the cost structure set forth in Exhibit C, which relates to the same country in which the Services are to be performed.

C.      "Purchase Order" is defined as a standard CUSTOMER Purchase Order that shall be employed for this Agreement exclusively for administrative and billing purposes.

D.      "Services" is defined as those services provided by the CONTRACTOR as described in Exhibits A and/or Exhibit B

## II. SERVICES

A.      During the term of this Agreement, CONTRACTOR shall perform the Services at the prices set forth in Exhibit C. Also, the parties contemplate that CUSTOMER will engage

DMWEST #6602033 v1

CONTRACTOR to perform individual event services, each of which prior to commencement must be approved with signature by CUSTOMER and Contractor and detailed in a separate "Event Proposal Agreement". A template for each such additional "Event Proposal Agreement" attached hereto as Exhibit B, and when completed and executed by the parties shall be differentiated such that each additional "Event Proposal Agreement" shall be labeled with the name and date of the Event. CONTRACTOR agrees that no other services shall be provided to CUSTOMER that would cause CUSTOMER to incur any additional fees without the prior consultation and written approval of CUSTOMER pursuant to Section XIV., Subsection D. of this Agreement.

B.   CONTRACTOR is not authorized to commence work until this Agreement has been fully executed. CUSTOMER shall incur no obligation to CONTRACTOR to pay for work performed on Services prior to the date of issue of this Agreement. To the extent that CONTRACTOR chooses, even at CUSTOMER urging, to commence work in advance of receipt of a fully executed Agreement, CONTRACTOR does so at its own risk.

C.   Assumptions with regard to the Services are as follows:

   (i)   As part of any Statement of Work for Services, the technical specifications and service levels set forth in Exhibit A or additional "Event Proposal Agreement" in Exhibit B, attached hereto, shall be utilized and provide a standard by which CUSTOMER shall assess CONTRACTOR'S performance. In areas where no specifications or service levels are provided, CONTRACTOR shall use standard industry solutions which meet or exceed the requirements of the specific Services, and which result in the lowest cost consistent with those requirements.

   (ii)   Except as specifically set forth in Exhibits A or B hereto, CONTRACTOR shall be free to exercise its discretion as to the method and means of performance of the Services in order to minimize cost, consistent with the applicable Quality provisions herein.

   (iii)   All travel related to the Services and for which CONTRACTOR expects to seek reimbursement from CUSTOMER shall require (a) that CONTRACTOR personnel's travel arrangements be made through CUSTOMER travel agency, except when CUSTOMER requests that CONTRACTOR book travel directly (b) that travel arrangements be in compliance with the CUSTOMER Travel Policy, and (c) that prior e-mail approval to travel in connection with such Services is obtained from CUSTOMER representative listed in Section XIV, Subsection I. of this Agreement. Travel and travel-related expenses shall not exceed 10% of the cost of the underlying good and services. CONTRACTOR and Customer agree that there are not expected expensed for the initial SOW, or subsequent Event Proposal Agreements.

D.   Acceptance or Rejection of CONTRACTOR Personnel. CUSTOMER reserves the right to reject at any time for any reason the assignment of any CONTRACTOR personnel to perform in whole or in part the Services. However, CUSTOMER agrees that CONTRACTOR personnel will not be rejected until the issues have been discussed with CONTRACTOR'S Account Representative, but in all cases CUSTOMER reserves the unilateral right to make such rejections.

DMWEST #6602033 v1      2

E.    CONTRACTOR personnel:

    (i)     CONTRACTOR is prohibited from directly hiring any past or present CUSTOMER employee for purposes of providing Services under this Agreement without prior written consent from CUSTOMER.  Likewise, during the period Services are being provided, CUSTOMER agrees not to directly solicit for hire any CONTRACTOR employees working directly or indirectly on Services without prior written consent from CONTRACTOR representative for the period of the Service.

    (ii)    CONTRACTOR'S employees shall in no sense be considered employees or agents of CUSTOMER, nor shall they be entitled to or be eligible, by reason of the contractual relationship hereby created, to participate in any benefits or privileges given or extended by CUSTOMER to its employees.  CONTRACTOR'S employees shall have no authority to act on behalf of CUSTOMER and shall have no authority to bind CUSTOMER in any contractual relationship unless authorized in writing in advance by CUSTOMER' Purchasing.

### III. WARRANTIES; SERVICE LEVELS; PERFORMANCE METRICS; PENALTIES

A.    CONTRACTOR warrants and represents that the Services to be provided under this Agreement shall be given by CONTRACTOR freely and solely in exchange for the fee(s) stated herein, with no expectation for any additional compensation unless expressly agreed to in writing by the parties.

B.    CONTRACTOR represents and warrants that CONTRACTOR shall use its best efforts to perform the Services in the most cost-effective and efficient manner consistent with the required level of quality.

C.    CONTRACTOR warrants that the Services, product and/or materials provided by CONTRACTOR or any of CONTRACTOR'S Subcontractors under this Agreement shall be free of any defects in design, material and workmanship, and shall also conform with all of specifications for such Services, products and materials to which the parties agreed to in writing or, if not in agreed to in writing, then as represented by CONTRACTOR prior to CUSTOMER being provided the Services, products, and/or materials for a period of sixty days from the effective date of this Agreement.

D.    <u>Failure of Service</u>.  CONTRACTOR will provide a reasonable level of redundancy at the costs outlined in this agreement, to mitigate occasional degradation of acceptable services caused by technological circumstances beyond CONTRACTOR's reasonable control.  In the event of a significant degradation of signal/or momentary loss of the Services, CONTRACTOR will switch to the redundant services and CUSTOMER is advised that it may cause loss of program material.  Any such degradation and/or momentary loss of programming will not constitute a failure of performance by CONTRACTOR.

DMWEST #6602033 v1      3

If program material is interrupted or lost due to acts or omissions of CONTRACTOR, its vendors, or contractors, CONTRACTOR will credit CUSTOMER the portion of the costs associated with the site/location affected.

E.    CONTRACTOR hereby assigns, and represents that it has the authority to assign, to CUSTOMER any and all manufacturer's and supplier's warranties, express or implied, representations, service agreements, patents and other indemnities, if any, with respect to all products and materials sold to CUSTOMER. CONTRACTOR agrees, upon written request from CUSTOMER, to take all reasonable action to enforce any such warranty, express or implied, representation, service agreement or indemnity, issued on or applicable to the products and materials which are enforceable by CONTRACTOR in its own name.

## IV. TERM; RENEWAL

The Parties agree that the initial term ("Term") of this Agreement shall be for three (3) years, commencing on the Effective Date and terminating at the end of the three (3) year period unless extended or terminated sooner in accordance with the provisions of this Agreement. If mutually agreed between the CUSTOMER and CONTACTOR, the CUSTOMER shall have the right to extend this Agreement for an additional twelve (12) months, and although pricing maybe adjusted based on changes in third party costs, any and all changes will be provided to CUSTOMER 6 months prior to contract end date for CUSTOMER review. Despite the termination or expiration of this Agreement, its terms shall remain in affect as to the any one or more "Event Proposal Agreements" whose terms may extend beyond the termination or expiration of this Agreement. Such "Event Proposal Agreements may either expire according to their terms or be terminated in accordance with Section V.

## V. TERMINATION

A.    Termination of Entire Agreement

If either party is in material breach of this Agreement, and fails to adequately cure such breach within thirty (30) days after written notice thereof, the non-breaching party may terminate this Agreement immediately. Upon termination, CONTRACTOR shall be paid for the Services rendered according to the terms of this Agreement up to the date of termination, but shall refund any prepayment for services not performed. If any Services have been scheduled or prepaid by CONTRACTOR through a third party provider to continue or occur after the date of termination, and cancellation of such Services would incur a cancellation fee, CUSTOMER shall pay CONTRACTOR all applicable fees within thirty (30) days of an invoice therefor. CONTRACTOR shall use commercially reasonable efforts to avoid the inclusion of cancellation fee clauses in its service agreements.

In the event either party terminates this Agreement for cause, at CUSTOMER' request, CONTRACTOR shall continue to provide the Services outlined in this Agreement on the same terms set forth herein for a period of not more than six (6) months ("Transition Period"). The Transition Period shall be utilized to enable CUSTOMER to contract the Services to a third party or internally to CUSTOMER.

B. Cancellation of Individual Events. This cancellation policy is designed for satellite programs occurring in the pharmaceutical industry. CUSTOMER understands and agrees that CONTRACTOR, as the supplier of satellite and ancillary services to CUSTOMER, incurs both in-house and 3rd party costs from the provisioning of the Satellite Services from the date CUSTOMER authorizes CONTRACTOR to proceed with the Satellite Services. Furthermore, CONTRACTOR incurs an actual cost when a Broadcast is booked and then postponed or cancelled as CONTRACTOR'S other clients are unable to contract for a Broadcast on the Broadcast date. In an attempt to reduce the risk of revenue loss and protect both CUSTOMER and CONTRACTOR in the event of a postponed or cancelled program, CUSTOMER agrees to pay CONTRACTOR cancellation fees in accordance with the cancellation policy as follows: (also attached hereto in table format as Exhibit D. In the event of any contradiction in terms or policy, this policy statement in Section V, B shall take precedence).

a. Policy. Upon CUSTOMER signing a program's "Event Proposal Agreement", or if "Event Proposal Agreement" is not signed, then by verbal or written agreement to the proposed program costs, and in the event that CUSTOMER cancels the program for which contract has been signed, CUSTOMER shall pay to CONTRACTOR a cancellation fee as follows:

| By 5pm ET less than 15 calendar days of the Event: | 100% of the Total Compensation |
|---|---|
| By 5pm ET more than 15 calendar days but less than 30 calendar days before the Event: | 75% of the Total Compensation |
| By 5pm ET 30 calendar days or more before the Event: | 50% of the Total Compensation |

The term "Total Compensation" includes all of the following: uplink related fees, temporary downlink related fees, network/administrative management related fees, AV related fees, transmission related fees, applicable taxes/fees, and project manager related fees, along with any other incurred fees that fall outside of the above categories for which CONTRACTOR has been contracted and requested to provide, as evidenced by the signed "Event Proposal Agreement".

b. Exclusions. CUSTOMER will not be responsible for payment of cancellation fees to CONTRACTOR in the following scenarios; if CUSTOMER should provide an ad-hoc or permanent network satellite location to CONTRACTOR for provisioning and then later remove, or withdraw, that same individual location from the program 15 calendar days or more before the event for an ad-hoc location, or 7 days or more before the event for a permanent network location, AND if there are no applicable charges from a phone or site survey or other ancillary service executed before the location is withdrawn, then

there will be no cancellation charge from CONTRACTOR to CUSTOMER for that individual location. Up to 10% of an event's downlinks may be cancelled for permanent locations with no charge. If CUSTOMER should provide a permanent network satellite location or set of locations to CONTRACTOR for provisioning and then later cancel or reschedule the program in its entirety more than 30 calendar days before the event, AND if there are no applicable charges from a phone or site survey or other ancillary service executed before the location is withdrawn, then there will be no cancellation charge from CONTRACTOR to CUSTOMER for any permanent network locations.

c. <u>Individual Location Cancellation Where Full Charges Apply</u> – if an individual ad-hoc satellite location is removed from a CUSTOMER program less than 15 calendar days of the program date, or if a permanent network satellite location is removed from a CUSTOMER program less than 7 calendar days of the program date, then that individual location will be subject to 100% cancellation fees from CONTRACTOR to CUSTOMER, to include the TVRO rate, survey rate, and any other ancillary service executed. Except, up to 10% of an event's downlinks may be cancelled for permanent locations with no charge

d. <u>Surveys and Services Performed and Billed</u> – In the case of section B.b. where Customer cancels and/or withdraws an ad-hoc or permanent network location more than 15 calendar days before the event, or more than 7 days before the event for a permanent network location, and that does have services that were executed by CONTRACTOR or its subcontractors for that location, CONTRACTOR will bill CUSTOMER for these services. The exception is removing a permanent network location, which will only incur fees billed if cancelled between 0-30 days before the event and will incur no charges if cancelled outside of 30 days. Billable items may include but are not limited to; onsite or phone surveys, travel, permits, or insurance. These services will be billed at the agreed upon rate per this Agreement or agreed upon contract rate.

C.    Postponement of Events - If a program is postponed more than 15 days prior to the program date, CONTRACTOR will not charge CUSTOMER for any uplink costs, satellite time or CONTRACTOR management fee. Charges for a temporary satellite will not be affected. To qualify for postponement, a new broadcast for a postponed program must be scheduled within 90 days of the cancellation date and the new Broadcast must occur within 12 months. If any one of the items above does not occur (postpone more than 15 days prior to the program date, rescheduled within 90 days of the cancellation date, and the new Broadcast must occur within 12 months), then full cancellation charges will apply, as referred to by the term 'total compensation' as set forth in this Agreement.

## VI. INVOICES, PAYMENT TERMS, PURCHASE ORDERS AND TAXES

A.    <u>Compensation for individual events.</u> CUSTOMER shall pay to CONTRACTOR full consideration for the Services, subject to modification due to contingencies arising at individual

Events ("Compensation").  All Compensation shall be paid in United States Dollars.  The Compensation shall be paid as follows:

| Upon the execution of each separate "Event Proposal" (as outlined in Exhibit A, sample form) | 50% of the Total Compensation |
| Not more than 30 days after invoice: | The remaining balance and any contingency amounts due |

B.   Compensation for Permanent Network.  CONTRACTOR shall provide CUSTOMER a monthly invoice denoting the period and detailed statement of Services completed for such services identified as a monthly service.  For the remainder of Services, the invoice will be prepared within 10 days of the completion of service or within 10 days of the equipment being shipped by the CONTRACTOR.  Each such invoice shall be submitted via email or, if CUSTOMER so directs, the invoice shall be sent to the following address:

GlobeCast Enterprise Services, LLC

1193 West 2400 South Suite A

Salt Lake City, UT 84119

Attention:  Account Payable

C.   Payment terms shall be net thirty (30) days from date of receipt of correct invoice.

D.   Purchase Orders shall describe the Services to be purchased; the identity of the product and/or materials being purchased; the quantity to be purchased; the delivery destinations; the requested delivery dates and any other information required by this Agreement. CONTRACTOR shall accept all Purchase Orders consistent with the terms and conditions of this Agreement that are submitted in accordance with this Section.  The terms and conditions of this Agreement relating to the purchase of the Services, product and/or materials shall be deemed incorporated into and made a part of each Purchase Order. Any terms and conditions appearing in any Purchase Order or in any acknowledgment or acceptance of a Purchase Order that are inconsistent with, or in addition to (except as such additional terms are required by law) the terms and conditions of this Agreement shall be void and of no effect.

E.   CUSTOMER may make payment check or wire funds transfer to the account of the CONTRACTOR.  Use of prominent credit card may be accepted if agreed by the CONTRACTOR.  A small fee may be required for use of the card.

F.   No tax deductions will be made from CONTRACTOR'S compensation, since CONTRACTOR will be functioning as an independent contractor. CONTRACTOR shall be responsible for the

payment of any estimated state and federal income tax liability, social security and self-employment tax liability, and for maintaining appropriate records relating thereto as an independent contractor.

## VII. REPORTS

A.   CONTRACTOR shall submit mutually agreed upon reports to CUSTOMER covering the topics mutually agreed to. CUSTOMER at any time may request new reports and CONTRACTOR shall comply with such requests in a timely manner and to the extent such reports are commercially reasonable.

B.   Ownership of reports: All reports delivered to CUSTOMER under this Agreement shall be construed as works-for-hire, and shall become the sole and exclusive property of CUSTOMER without restriction as to use.

## VIII. SECURITY

A.   CONTRACTOR accepts responsibility and agrees to be accountable for the handling of CUSTOMER'S trade secrets, all business, technical, manufacturing, marketing, sales, financial or other confidential and proprietary information and know how (collectively referred to herein as "Data") and for controlling access to the same. Any violation or failure to meet the guidelines below would be cause for termination of this Agreement.

B.   When performing Services, the CONTRACTOR shall require its employees to adhere to all of the Data security rules established from time to time by CUSTOMER, if any, and the requirements for protection of confidential information in this Agreement. It shall be the CONTRACTOR'S responsibility to know these rules and remain current in their use as they are provided by the CUSTOMER. It shall also be the CONTRACTOR'S responsibility, at no additional cost to CUSTOMER, to train and update its employees on these rules.

C.   Data Security. As part of the Services, CONTRACTOR shall be responsible for the implementation and maintenance of safeguards against, the destruction, loss or alteration of CUSTOMER Data. In the event CONTRACTOR or CONTRACTOR'S agents discover or are notified of any breach or potential material breach of security of CUSTOMER Data, CONTRACTOR shall immediately (1) notify the CUSTOMER representative of the same and (2) if CUSTOMER data was in the possession of CONTRACTOR or the CONTRACTOR'S agents, as part of the Services, CONTRACTOR shall investigate the breach, or potential breach, and provide CUSTOMER with a complete and accurate written report of said investigation.

## IX. CONFIDENTIAL INFORMATION

A.   Each party (for purposes of this Section, the "Recipient"), agrees to hold in confidence and keep confidential the Confidential Information (defined below) disclosed by the other party (the "Disclosing Party"}.

B.    In this Agreement, the term "Confidential Information" shall mean all information relating to the management, operations, products and intellectual property of the Disclosing Party, including, without limitation, any and all information relating to inventions, trade secrets, know-how, designs, samples, processes, product performance data, supplier lists, CUSTOMER lists, financial data, marketing information and computer programs.

C.    The Recipient shall not use or disclose any such Confidential Information with or to any third party except by written approval of the Disclosing Party and:

   (i)    Recipient will not, and will ensure that each of its directors, officers, employees, affiliates, licensees, including sub licensees (collectively, the "Recipient's Agents") will not, directly or indirectly, use or disclose any such Confidential Information except to the extent that it is strictly necessary for the execution of the Service and the performance of this Agreement including the express licenses granted herein;

   (ii)   Recipient will cause the Recipient's Agents that are recipients of or exposed to such Confidential Information, to execute confidentiality agreements to protect the same; and

   (iii)  Recipient will, and will ensure that each of the Recipient's Agents will use commercially reasonable best efforts to maintain all such Confidential Information in a manner so as to protect the same against wrongful disclosure, misuse, espionage and theft. In so doing, each party shall exercise the same care in preventing unauthorized disclosure or use of the Disclosing Party's Confidential Information that Recipient takes to protect its own Confidential Information of a similar nature, which in no case shall be less rigorous than the best practices of the industry.

D.    Exceptions for Confidentiality.  Nothing in this Agreement will prevent the Recipient or the Recipient's employees and permitted subcontractors from making use of or disclosing any Confidential Information disclosed to them by the Disclosing Party:

   (i)    Which is or becomes generally available to the public through no breach of this Agreement or any other obligation of the Recipient or the Recipient's Agents to the Disclosing Party;

   (ii)   Of which the Recipient or the Recipient's Agents had knowledge before the date of this Agreement, as evidenced by competent proof, unless the same was disclosed to the Recipient or the Recipient's Agents by the Disclosing Party;

   (iii)  Of which the Recipient or the Recipient's Agents obtained knowledge from a third party, as evidenced by competent proof, unless such third party obtained such Confidential Information in violation of any duty of confidence owed to the Disclosing Party;

   (iv)   Which is independently developed by the Recipient as evidenced by competent proof, without in any way using the Confidential information of he Disclosing Party and without the air or utilization of the personnel involved in the performance of this Agreement, or

(v)  Which is required to be disclosed pursuant to law or a rule, regulation, policy or order of a governmental authority having jurisdiction or pursuant to a final order or judgment of a court of competent jurisdiction and in such case the parties will cooperate with one another to obtain an appropriate protective order or other reliable assurance that confidential treatment will be afforded to such Confidential Information.

E.  Use and Distribution of Confidential Information.  Confidential Information shall only be released to the Recipient's Agents on a need to know basis, and the Recipient shall establish procedures to ensure that the Confidential Information is restricted in release to the smallest number of the Recipient's Agents who are authorized and have a need to know and use the information of the Disclosing Party.

F.  Non-Disclosure of Agreements.  Except as may be required by law or applicable securities regulatory authorities, neither party will make public the existence of this Agreement or the negotiations leading to or pursuant to this Agreement without the written consent of the other party, as provided by the publicity provisions of this Article.

H.  Non-Competition Agreement.  The parties agree to become subject to the terms and conditions of the Non-Compete Agreement, attached hereto as Exhibit E.

I.  After either termination or expiration of this Agreement, CONTRACTOR will destroy or return to CUSTOMER all Confidential Information, materials, data and documents provided to CONTRACTOR by CUSTOMER and the material developed pursuant to Purchase Orders under this Agreement.

After either termination or expiration of this Agreement, CUSTOMER will, in accordance with CONTRACTOR'S request, either destroy or return to CONTRACTOR all Confidential Information, materials, data and documents provided to CUSTOMER by CONTRACTOR.

## X. INDEMNITY and HOLD HARMLESS

It is expressly agreed and understood that, to the fullest extent permitted by law, that CONTRACTOR shall indemnify, protect, defend, and save (hold) harmless CUSTOMER, its officers, agents, employees from any and all liabilities, penalties, costs, losses, damages, expenses, causes of action, claims judgments or any demands whatsoever, including prejudgment interest, attorney's fees, expert witness fees and all other expert and professional fees and expenses ("Claims(s)"), based on or resulting from (i) any personal injury, including, but not by way of limitation, bodily injury, emotional injury, sickness or disease, or death to any person including but not limited to agents employees of CUSTOMER or damage to property of anyone (including loss of use thereof), which injury, sickness, death or damage results from, arises out of or is in any way connected with the performance of this Agreement or the Services by CONTRACTOR or its Subcontractors, (ii) breach of any provision of this Agreement, (iii) any violation by CONTRACTOR or its personnel of any local, state or Federal law , rule or regulation; or (iv) any willful misconduct, negligent act or omission by CONTRACTOR or its personnel. CONTRACTOR'S obligation under this paragraph

shall apply whether the Claim is caused or alleged to be caused by any active or passive act or omission of CONTRACTOR, CUSTOMER or other party indemnified hereunder, provided however, that CONTRACTOR shall not be obligated to indemnify for those Claims which arise from the sole negligence or willful misconduct of CUSTOMER or its agents.  In Claims against any person or entity indemnified under this paragraph by an employee of CONTRACTOR, any one directly or indirectly employed by CONTRACTOR or anyone for whose acts CONTRACTOR may be liable, CONTRACTOR'S obligations under this paragraph shall not be limited by a limitation on amount or type of damages, compensation or benefits payable by or for CONTRACTOR under workers' or workmen's compensation acts, disability benefit acts or other employee benefit acts.  The foregoing and any other provision of this Agreement notwithstanding, CONTRACTOR shall be solely liable for any injury or death to employees or subcontractors of CONTRACTOR or damage to CONTRACTOR'S property occurring on CUSTOMER premises for any reason.  The party seeking indemnification shall promptly notify the other party of any Claims.

## XI. INSURANCE

During the term of this Agreement, CONTRACTOR shall maintain or cause to be maintained, the following insurance:

A.   Comprehensive General Liability – Minimum $4,000,000 single limit.  CUSTOMER should be added as additional bodily injury and property damage insured and the CONTRACTOR'S insurance is to be endorsed as primary coverage.

B.   Automobile Liability – Minimum $ 4,000,000 single limit.  CUSTOMER should be added as additional bodily injury and property damage insured and CONTRACTOR'S insurance to be endorsed as primary coverage.

C.   Worker's Compensation - Minimum applicable Statutory Worker's/Workmen's Compensation Coverage for the State in which contract or work is delivered and/or the employee's normal State of employment (excludes sub-contractors).

D.   Employer's Liability – Minimum $4,000,000 Each Accident, Disease–Each Employee, Disease–Policy Limit.

E.   CONTRACTOR agrees to cause its insurers to provide CUSTOMER at least thirty (30) days notice of cancellation of, or any material changes in, the above listed coverages.

F.   Waiver of Subrogation.  Before performing any Services under any SOW, CONTRACTOR shall secure from its insurer(s) a Waiver of Subrogation against CUSTOMER in all of the insurance policies applicable to the Services.

G.   Certificate of Insurance.  CONTRACTOR shall provide to CUSTOMER a certificate(s) of insurance as evidence of the required coverage before CONTRACTOR performs any Services

under any SOW.   Such certificate(s) shall (i) name CUSTOMER as an additional insured; (ii) state that the minimum coverages required by CUSTOMER have been provided and are in effect; AND (iii)  apply to all applicable SOWs under this Agreement.

H.     The amount of insurance contained in the aforementioned insurance coverages shall not be construed to be a limitation of liability on the part of CONTRACTOR or any if its subcontractors.

## XII. DISPUTE RESOLUTION

CONTRACTOR and CUSTOMER agree to settle by binding arbitration any dispute or controversy between CONTRACTOR and CUSTOMER and/or any of CUSTOMER'S officers, employees, directors or agents which in any way arises out of or relates to this Agreement, the Services performed by CONTRACTOR hereunder or the relationship between CONTRACTOR and CUSTOMER.  Such arbitration shall be conducted in the location of the party filing the dispute by the American Arbitration Association under the Commercial Arbitration Rules then in effect.  Either CONTRACTOR or CUSTOMER may initiate arbitration by serving or mailing a written notice to the other. Any award entered by the arbitrator(s) shall be final and judgment thereon may be entered in any court having jurisdiction.

## XIII. REPRESENTATIONS AND OBLIGATIONS

A.     Each party represents to the other that the execution, delivery and performance of this Agreement has been duly authorized.

B.     That CONTRACTOR shall comply with all applicable Federal, state and local laws and regulations applicable to it and shall obtain all applicable permits and licenses required of it in connection with its obligations and CONTRACTOR'S obligations under this Agreement.

C.     CONTRACTOR agrees to comply with the United States Generally Accepted Accounting Principles, and if requested to by CUSTOMER, CONTRACTOR will comply with and assist CUSTOMER as reasonably necessary in its compliance with the requirements of the Sarbanes-Oxley statute and related regulations.

D.     Publicity Restrictions.  During the term and at all times after the termination or expiration of this Agreement, CONTRACTOR shall not make any media release or other public announcement relating to or referring to this Agreement without CUSTOMER's prior written consent.  CONTRACTOR shall acquire no right to use, and shall not use, without CUSTOMER's prior written consent any artwork, designs, trade names, copyrighted materials, trademarks or service marks of CUSTOMER:  (a) in any advertising, publicity, press release, client list, presentation or promotion; (b) to express or to imply any endorsement of CONTRACTOR or CONTRACTOR'S services; or (c) in any manner other than expressly in accordance with this Agreement.

## XIV. MISCELLANEOUS

A.   Governing Law and Venue.  This agreement shall be governed and construed according to the laws of the State of Utah.

B.   Independent Contractor.  CONTRACTOR is an independent contractor.  Nothing herein contained will establish a partnership between, or joint venture of, the parties hereto or establish either party the agent of the other.

C.   Extended Meanings.  In this Agreement, words importing the singular number include the plural and vice versa and words importing gender include all genders.  The word "person" includes, subject to the context in which it appears, an individual, partnership, association, body corporate, trustee, executor, administrator or legal representative.

D.   Notice.  Any notice, demand or other communication required or permitted to be given to either party shall be in writing and shall be:

(i)     Personally delivered to such party;

(ii)    Sent by prepaid overnight courier; or

(iii)   Sent by certified mail, return receipt requested.

Any notice, demand or other communication given pursuant to Subsections (i), (ii) and (iii) above shall be delivered or sent to the intended recipient at its address below:

   If to CUSTOMER:

Doug Mack, CEO & President
ESSRx, Parent Company to:
AV Solutions & Total Health Rewards
322 Route 46 West, Suite 260W
Parsippany, NJ 07054

   With a copy to:

Annette Velotto
AV Solutions, LLC
322 Route 46 West, Suite 260W
Parsippany, NJ 07054

   If to CONTRACTOR:

Keven Cahoon, CEO
GlobeCast Enterprise Services, LLC

DMWEST #6602033 v1      13

1193 West 2400 South, Suite A
Salt Lake City, UT 84119

    With a copy to:

Dan Loveless, Director of Sales
GlobeCast Enterprise Services, LLC
1193 West 2400 South, Suite A
Salt Lake City, UT 84119

Any party may from time to time change its address by written notice to the other party given in accordance with the provisions hereof.

Any notice, demand or other communication delivered in accordance with Subsections (i), (ii) or (iii) above shall be deemed to have been received on the day of its delivery.

E.    **Waiver and Amendment.**  No amendment or waiver of this Agreement shall be binding unless executed in writing by both parties.  Only CUSTOMER' Purchasing is authorized to sign such amendments or waivers on behalf of CUSTOMER.  No waiver of any of the provisions of this Agreement shall constitute a waiver of any other provision (whether or not similar) nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

F.    **Severability.**  Any provision in this Agreement which is held to be illegal or unenforceable shall be ineffective to the extent of such illegality or unenforceability without invalidating the remaining provisions and any such illegal or unenforceable provision shall be deemed to be restated to reflect as nearly as possible the original intentions of the parties in accordance with applicable law.

G.    **Compliance with Local Rules.**  While at the CUSTOMER locations, CONTRACTOR and CONTRACTOR Agents shall comply with reasonable requests, standard rules and regulations of CUSTOMER regarding personal and professional conduct.

H.    **Force Majeure.** Neither party shall incur liability to the other for delay in performance or for failure to perform under this Agreement if due to causes beyond its control, including, but not limited to, acts of God, acts of war, fire, riot, or intervention by any governmental authority, and each party shall take steps to minimize any such delay.

I.    **Engagement Management.**    The overall engagement and performance of Services shall be managed by and under the direct supervision of CONTRACTOR'S ENTERPRISE CLIENT MANAGER.  The Agreement 'owner' and primary contact at CUSTOMER shall be Doug Mack, CEO and President, (973) 882-4550.

J.    **Survival.** The following sections shall survive the termination and/or expiration of this agreement: confidentiality, indemnity and hold harmless, governing law, dispute resolution, intellectual property, warranties, and all subparts of this Section XIV.

K.    **Limitation of Liability.**  IN NO EVENT SHALL CUSTOMER OR CONTRACTOR BE LIABLE FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL, OR INCIDENTAL

DAMAGES, HOWEVER CAUSED AND REGARDLESS OF THEORY OF LIABILITY, ARISING IN ANY WAY OUT OF THIS AGREEMENT, EXCEPT FOR LIABILITY ARISING FROM FAILURE TO COMPLY WITH CONFIDENTIAL INFORMATION PROVISIONS OR MISUSE OF INTELLECTUAL PROPERTY.

L.  Publicity Releases and Announcements.  CONTRACTOR agrees that prior to making any publicity release, announcement or any public disclosure relating to this Agreement and/or CUSTOMER' involvement in activity under this Agreement, consent in writing to do so must first be obtained for each such release, announcement or disclosure from CUSTOMER' Public Relations, except as required by law or regulatory bodies in which case CUSTOMER shall be notified prior to such required release, announcement or disclosure.

M.  No License.  Other than the express licenses granted in this Agreement, if any, no license, express or implied, by estoppel or otherwise, is granted to any intellectual property that is now or may hereafter be owned by a party by the disclosure of Confidential Information under this Agreement.

N.  Assignment. Neither party may assign this Agreement or any interest, obligation, payment or rights hereunder without the prior written consent of the other party.

O.  Counterparts.  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one single agreement between the parties.

P.  Right to Audit.  CUSTOMER reserves the right to audit compliance with the implementation of any and all aspects of this Agreement, and to require CONTRACTOR'S documentation of its processes to the extent of such processes may impact the accuracy of CUSTOMER financial reporting. This includes the right to hire and assign independent auditors to review compliance on behalf of CUSTOMER. Refusal to allow or cooperate with such an audit will be considered grounds for termination for cause under Section V.

Q.  Entire Agreement.  This Agreement contains the entire agreement between the parties, and supersedes all previous negotiations, letters of intent, letter contracts, writings, agreements and understandings, if any, heretofore had between the parties with respect to the subject matter hereof.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

CUSTOMER INC.                          (Name of CONTRACTOR)

_____                _____
(Signature)                            (Signature)

Doug Mseh                              Keven Cahoon
_____                _____
(Type/Print Name)                      (Type/Print Name)

President                              President
_____                _____
(Title)                                (Title)

DMWEST #6602033 v1      15

_____          _____
(Date)                             (Date)


## EXHIBIT A

### Statement of Work for
### Permanent Satellite Network

This Statement of Work ("SOW") effective as of the date of signature of this Agreement June 1, 2009 ("SOW Effective Date"), is a part of and incorporated into the Master Services Agreement ("Agreement"), between CUSTOMER Inc. ("CUSTOMER" or "Customer") and GlobeCast Enterprise Services ("CONTRACTOR").

Capitalized terms not defined in this SOW are as defined in the Agreement. In the event of any conflict between the Agreement and this SOW, the terms of the Agreement shall govern.

**Contacts**:

      Company Representative:
      Address:

      Telephone number:
      Fax number:
      Email address:


**Description of Services**:

      <u>Galaxy 28</u>:

      Spacecraft Type: Three-Axis Stabilized
      Orbital Location: 89.0° West Longitude
      Orbital Control: +/- 0.05°
      Transponder: K604
      Bandwidth: 3 MHz
      Preemptibility: Non-Preemptible

      December 31, 2012
      Launch: 23 June 2005
      Payload: 8 x 72 MHz C-Band transponders
      20 x 36 MHz C-Band transponders
      24 x 36 MHz Ku-Band transponders
      6 x 66 MHz Ka-Band transponders

Frequency Bands:

C-Band:      Uplink 5925 – 6425 MHz
Downlink 3700 – 4200 MHz
Ku-Band:     Uplink 14.00 – 14.50 GHz
Downlink 11.70 – 12.20 GHz
Ka-Band:     Uplink 29.50 – 30.00 GHz
Downlink 19.70 – 20.20 GHz

**Beacons**:      4195 MHz (Horizontal)
                  4199.5 MHz (Horizontal)
                  11702 MHz (Horizontal)
                  12198 MHz (Vertical)
                  20199.8 MHz (Horizontal)

## CONTRACTOR defines a "Standard Install*" as:

- A three story or less building
- Roof material - asphalt shingles, rubber membrane, or tar & gravel
- Mount Types - 4' X 4' NPR, NPR ridge, or penetrating tripod
- 150' or less IFL cable run
- Roof access – roof hatch large enough to fit antenna/mount through or ability to pull equipment up the side of the building.
- Point of Entry – existing or available
- Must not require permits
- IFL cable does not run through other tenants office space
- Landlord approval has been granted
- CONTRACTOR will provide 150' of PVC cable, connectors and ballast

*Additional costs during a permanent installation may be incurred due to any of the following occurrences: day-of install delays caused by onsite contacts, landlords, building management…additional requests by onsite contacts causing increased time onsite, labor, or equipment…abort fees due to restricted site access after approval has been previously given…

## Additional Terms & Conditions Related to The Purchase of Satellite Capacity:

1.   The Service:

     Transponder Service is the supply of capacity to be managed by CUSTOMER.  Full-time Transponder Service will be Non-Preemptible and Fully Protected.  Transponder Services are non-cancellable.

2.   Charge for Failure to Vacate:

If CUSTOMER continues to use a Service past the Service End Date, CONTRACTOR reserves the right to continue to provide the Service to CUSTOMER on a fully Preemptible basis at a rate determined by CONTRACTOR in its sole discretion based on fees payable to third-party providers, and/or to take such further action(s) as may be necessary to bring down the Service.

3.   Service Restoration:

In the event any other Service provided by CONTRACTOR hereunder fails, CONTRACTOR may, in its sole discretion, restore such Service.  Restoration may be made on the affected satellite or on another Intelsat satellite then in orbit where the capacity shall provide similar coverage and equivalent performance.  Such capacity will then become the Service. If CONTRACTOR, in its discretion, does not restore or attempt to restore a failed Service hereunder, the relevant Service Contract or Service Order shall be deemed terminated without further liability as of the time of failure.

4.   Service Interruption Credits / Outage Credits:

A Service interruption or confirmed outage is defined as any period during which a Service fails to meet the minimum performance parameters for the before quoted Service.

Interruption Credit or Outage Credit means a credit to be given by CONTRACTOR to CUSTOMER against future service provided by CONTRACTOR.  Interruption Credits or Outage Credits will be given for Service Interruption of one (1) hour or more, and will be calculated as a proportion of monthly service, based on the number of hours in the month during which the Service Interruption or Confirmed Outage occurred. Credit will be defined as the amount of the proportional cost/value of the amount of time of the Service Interruption, as calculated by Intelsat.

Measurement of periods of Service Interruption or Confirmed Outage shall commence when the Service fails to meet the minimum performance parameters established by Intelsat, and the failure is confirmed by Intelsat.  A Service Interruption or Confirmed Outage shall end when CONTRACTOR notifies CUSTOMER or CUSTOMER has actual knowledge that the Service has been restored to the specifications as provided Intelsat.  Any period during which CUSTOMER uses the applicable Service shall not count towards the duration of the Service Interruption or Confirmed Outage.

5.   Renewal:

Any renewal or extension of a Service will be the subject of a separate agreement between CUSTOMER and CONTRACTOR.

6.   End of Service:

If Intelsat, in its sole discretion, decides to take a Satellite out of commercial service at its orbital location before the Service End Date, CONTRACTOR shall give CUSTOMER reasonable notice under the circumstances of such determination and the

date the applicable Satellite will be taken out of service or redeployed at another orbital location. In such an event, this Service Order shall automatically terminate on the date that the Satellite is taken out of commercial service or redeployed, unless Intelsat, at its own option, continues to provide Service meeting the Service Specifications to CUSTOMER on an alternative or replacement satellite.

7. CONTRACTOR provides as part of its regular service offering 24 by 7 broadcasting over its platform of generic color bars and video tone. This signal can be accessed at any time prior to any broadcast and is a guaranteed service. This signal can be used by technicians and CUSTOMER representatives to assure that the satellite signal is being received at that location. In addition, two business days prior to a scheduled CUSTOMER broadcast, and upon availability, CONTRACTOR will, at the request of CUSTOMER, provide a "slate" that will state the name of the upcoming broadcast, date, and CONTRACTOR helpdesk phone number (s) and is intended to assist CONTRACTOR'S technicians and/or permanent network site contacts onsite at individual downlink locations with not only acquiring the broadcast signal, but can also confirm a particular CUSTOMER program. CONTRACTOR will limit this second option taking place two business days prior to the broadcast to a three (3) hour period from 3pm ET to 6pm ET . There is no guarantee of availability for customized day-before 'slates'; however, CONTRACTOR will provide under the terms of this agreement, at the request of CUSTOMER, a "slate" that will state the name of the upcoming broadcast, date, and CONTRACTOR helpdesk phone number on the day of broadcast, for a period of three (3) hours prior to the actual studio transmit. This day of service is also provided upon availability, is pre-emptible and applies for both permanent and temporary downlink sites.

8. Annual physical inspection of the satellite and AV equipment will be conducted by CONTRACTOR at the approval and request of CUSTOMER. Such visits would include both the satellite and AV equipment and would be priced at $450 per visit as per pricing in Exhibit C. if only inspecting the satellite, the charge will be $350.The PM visits include the following:

- Peak the antenna
- Retune the satellite receiver or IRD as needed
- Verify polarization alignment
- Full system check of the standard downlink package
- Check all system cables and connections
- Replace and reseal connectors as needed
- Touch up any areas of exposed metal and general clean up
- Document current system configuration for the Help Desk Database
- Provide client with maintenance and evaluation reports
- Check and confirm operation of all AV Equipment as mutually agreed between CONTRACTOR and CUSTOMER.

9. Items included and not included in flat rate temporary downlink pricing in Exhibit C.

DMWEST #6602033 v1       19

**Single and dual feed flat rates <u>include</u>:**

- 1 x TVRO technician
- Up to 8-hours onsite
- 1 x phone survey or 1 x site survey
- Roof mount (up to 10 stories)
- Travel (intrastate) and fuel costs
- City parking permits up to $300
- Cabling (up to 300 ft.)
- 2 x satellite receivers (single), 4 x satellite receivers (dual), 1 x antenna kit

**The following items are <u>NOT</u> included in the flat rate and overages *may* be incurred on a bid-only basis (anything not listed below will also be bid-only):**

- Day before set up (needed for morning programs and difficult set ups)
- More than 8 hours onsite
- Interstate travel (if a venue for a program is booked outside of the USA top 100 MSA's)
- Extended cable runs over 300'
- Any venue/customer requests requiring additional labor or equipment (AV assistance, moving rooms on short notice, additional equipment, etc...)
- Late/remote site additions given to CONTRACTOR with less than 1 week to the event date (in this case, a $300 expedite fee will occur on top of the normal rates and only best efforts apply)
- Early morning/late evening broadcasts requiring onsite times outside of normal hours (normal is defined as 8am-8pm local time)
- Hotels needed due to early morning or late night broadcasts or extended travel from technician's base location
- Additional insurance requirements (i.e. – additionally insured, umbrella coverage, broadcast insurance...)

10.  All phone and site surveys are included in the TVRO rates in Exhibit C, *except* for:

- Site Surveys that require a 48-hour turnaround/special request.
- A Phone or Site Survey for any location that ends up being cancelled or not used for the event after the survey is performed.

With both exceptions above, the surveys will be billed as an addition to any other event pricing:

<u>Cancelled/unused event locations where surveys were performed</u>

| | |
|---|---|
| Phone Survey | $50 |
| Site Survey | $250 |
| 48-Hour Site Survey | $500 |

<u>48-hour survey turnaround/special requests</u>

Site Survey*                                    $500

*CONTRACTOR will provide 'BEST EFFORTS' to ensure that 48-hour surveys are completed on time, and 90% of the time the request timeframe should be met.  CONTRACTOR does not guarantee 100% success in completing 48-hour surveys within the given timeframe.

# EXHIBIT B

## Event Budget Agreement (Sample)



**GlobeCast**
Enterprise Services

| | |
|---|---|
| Budget Created On: | September 18, 2008 |
| Budget Revised On: | December 2, 2008 |
| Event Name | Voice 2 Voice Broadcast |
| Name of Client | AV Relations & Total Health Records |
| Address of Client | 323 Power rd West, Suite 300W, Parsippany, NJ 07054 |
| Name of Contact | Doug Lloyd |
| Phone Number | (973)523-4639 x 108 |
| Event Date | December 10, 2008 |
| Origination Location | NEP Studios, NYC |
| Destination Locations | 80 Locations |
| Average Audience Size | 15 - 30 people per location |
| Event Details | Broadcast Def, 3 time zones. As running 1 hour program, 1 hour test, 30 minute Q&A-30 minute prep |

## EXHIBIT C

### Pricing

| Site Equipment | | |
|---|---|---|
| **DESCRIPTION** | | **EXTENDED PRICE** |
| Pansat HD boxes (Model 9200HD) | $ | 572.00 |
| 1.2 - M Antenna with NPR Mount | $ | 320.00 |
| LNB Norsat 4507A | $ | 90.00 |
| Optoma Projector | $ | 1,684.00 |
| Peerless UNIV Precision Gear Projector Bracket Mount | $ | 150.00 |
| Misc. hardware and cable for Projector Install | $ | 215.00 |
| set of JBL speakers | $ | 180.00 |
| Insignia 200 Watt 2.0 Channel Stereo Receiver | $ | 145.00 |
| Standard 1.2-M Installation Labor (Per site Price) | $ | 600.00 |
| Set top box Installation included in above | $ | - |
| Standard Installation of AV Equipment | $ | 400.00 |
| AV/Satellite Site Survey | $ | 500.00 |
| Shipping of satellite equipment | $ | 235.00 |
| Shipping of LCD | $ | 25.00 |
| Shipping of Audio equipment | $ | 35.50 |
| | $ | 5,151.50 |

## Site Equipment

| DESCRIPTION | EXTENDED PRICE |
|---|---|
| Pansat  HD boxes (Model 9200HD) | $  572.00 |
| 1.2 - M Antenna with NPR  Mount | $  320.00 |
| LNB Norsat 4507A | $   90.00 |
| LG 60PG30FC PLASMA HDTV 1080P | $ 2,945.00 |
| Universal Wall Mount for Plasma | $  135.00 |
| Misc. hardware and cable for Projector Install | $  100.00 |
| Set of JBL speakers | $  180.00 |
| Insignia 200 Watt 2.0 Channel Stereo Receiver | $  145.00 |
| Standard 1.2-M Installation Labor (Per site Price) | $  600.00 |
| Set top box Installation included in above | $      - |
| Standard Installation of AV Equipment | $  400.00 |
| AV/Satellite Site Survey | $  500.00 |
| Shipping of satellite equipment | $  235.00 |
| Shipping of plasma | $  250.00 |
| Shipping of Audio equipment | $   35.50 |
|  | $6,482.50 |

## Site Equipment

| DESCRIPTION | EXTENDED PRICE |
|---|---|
| Pansat  HD boxes (Model 9200HD) | $     572.00 |
| 1.2 - M Antenna with NPR  Mount | $     320.00 |
| LNB Norsat 4507A | $       90.00 |
| Standard 1.2-M Installation Labor (Per site Price) | $     600.00 |
| Set top box Installation included in above | $              - |
| Connect Satellite to Existing AV | $     400.00 |
| Satellite Site Survey | $     350.00 |
| Shipping of satellite equipment | $     235.00 |
| | $  2,567.00 |

## Site Equipment

| DESCRIPTION | EXTENDED PRICE |
|---|---|
| HD15 SVGA Monitor and Stereo Audio Cable - $18.00 + shipping | $       18.00 |
| Logitech Wireless Laptop Mouse (V220) - $38.00 + shipping | $       38.00 |
| labor to install wall jack | $     300.00 |
| Shipping of wireless mouse, VGA, and wall jack | $15.00 |
| | $     371.00 |

## Site Equipment

| DESCRIPTION | EXTENDED PRICE |
|---|---|
| HD15 SVGA Monitor and Stereo Audio Cable - $18.00 + shipping | $       18.00 |
| Logitech Wireless Laptop Mouse (V220) - $38.00 + shipping | $       38.00 |
| labor to install wall jack | $     200.00 |
| shipping of wireless mouse, VGA, and wall jack | $ 15.00 |
| | $     271.00 |

# Remote Downlinks: Temporary (TVRO) <u>STANDARD DEFINITION</u>

## 2009 Preferred Flat rate pricing

| DESCRIPTION | List Price | Discount Price |
|---|---|---|
| Sat. Downlink includes SD Receiver Rental Single Feed | $ 1,800.00 | $ 1,575.00 |
| Sat. Downlink includes SD Receiver Rental Single Feed PHONE SURVEY IN LIEU OF SITE SURVEY | $ 1,650.00 | $ 1,425.00 |
| Sat. Downlink includes SD Receiver Rental Dual Feed | $ 2,000.00 | $ 1,775.00 |
| Sat. Downlink includes SD Receiver Rental Dual Feed PHONE SURVEY IN LIEU OF SITE SURVEY | $ 1,850.00 | $ 1,625.00 |

## 2009 Ala Carte pricing

| DESCRIPTION | List Price | Discount Price |
|---|---|---|
| Sat. Downlink includes SD Receiver Rental Single Feed | $ 1,600.00 | $ 1,200.00 |
| Sat. Downlink includes SD Receiver Rental Dual Feed | $ 1,800.00 | $ 1,400.00 |

NOTE #5: See Flat Rate and Ala Carte Pricing Document for complete list of items included in both the Ala Carte and Flat Rate options

# Remote Downlinks: Temporary (TVRO) <u>HIGH DEFINITION</u>

## 2009 Preferred Flat rate pricing

| DESCRIPTION | List Price | Discount Price |
|---|---|---|
| Sat. Downlink includes HD Receiver Rental Single Feed | $ 2,300.00 | $ 2,175.00 |
| Sat. Downlink includes SD Receiver Rental Single Feed PHONE SURVEY IN LIEU OF SITE SURVEY | $ 2,150.00 | $ 2,025.00 |
| Sat. Downlink includes HD Receiver Rental Dual Feed | $ 2,600.00 | $ 2,375.00 |
| Sat. Downlink includes HD Receiver Rental Dual Feed PHONE SURVEY IN LIEU OF SITE SURVEY | $ 2,450.00 | $ 2,225.00 |

## 2009 Ala Carte pricing

| DESCRIPTION | List Price | Discount Price |
|---|---|---|

| | | |
|---|---|---|
| Sat. Downlink includes HD Receiver Rental Single Feed | $ 2,000.00 | $ 1,800.00 |
| Sat. Downlink includes HD Receiver Rental Dual Feed | $ 2,200.00 | $ 2,000.00 |

NOTE #6: See Flat Rate and Ala Carte Pricing Document for complete list of items included in both the Ala Carte and Flat Rate options

# Transport and Uplink in Standard Definition (SD)

## Option #1 - GlobeCast MCPC Platform with SD TVRO backhaul

| DESCRIPTION | List Price | Discount Price |
|---|---|---|
| SD TVRO Uplink Truck Rental | $ 3,000.00 | $ 2,500.00 |
| Backhaul Space Segment to Salt Lake City (9 MHz) | | $   300.00 |
| MCPC Space Segment on Galaxy 28 for 4 Mbps | $   750.00 | $   500.00 |
| Uplink and Encoding from Salt Lake City | Included | Included |
| Uplink Only to G28 Platform | | $ 200.00 |
| Turnaround Only | | $ 400.00 |
| **Broadcast/Site Encryption** | | Bid Only |
| Intelsat Analog C-Band Space | | $ 365.00 |
| Analog KU-Band Space | | $ 465.00 |
| 3rd Party Ad-Hoc Digital 9 MHz KU Space | | Bid Only |

## Option #2 - Single Hop from Uplink Truck to Down link sites

| DESCRIPTION | List Price | Discount Price |
|---|---|---|
| SD TVRO Uplink Truck Rental | $ 3,000.00 | $ 2,500.00 |
| Space Segment (9 MHz) | | $   300.00 |

## Transport and Uplink in High Definition (HD)

**Option #1- GlobeCast MCPC Platform with HD TVRO backhaul**

| DESCRIPTION | List Price | Discount Price |
| --- | --- | --- |
| HD TVRO Uplink Truck Rental | $ 4,500.00 | $ 3,800.00 |
| Backhaul Space Segment to Salt Lake City (18 MHz) | | $    375.00 |
| MCPC Space Segment on Galaxy 28 for 8 Mbps | $ 1,200.00 | $    800.00 |
| Uplink and Encoding from Salt Lake City | Included | Included |

**Option #2 - Single Hop from Uplink Truck to Down link sites**

| DESCRIPTION | List Price | Discount Price |
| --- | --- | --- |
| HD TVRO Uplink Truck Rental | $ 4,500.00 | $ 3,800.00 |
| Space Segment (18 MHZz) | | $    375.00 |

## Permanent Venues Rental

**CONTRACTOR use of Venues for its own events outside of CUSTOMER events**

| DESCRIPTION | List Price | Discount Price |
| --- | --- | --- |
| Per site Rental of Venue – Fee Paid to CUSTOMER | $ 500.00 | $ 395.00 |

**CONTRACTOR Minimum fee charged to 3rd party for use of Venues**

| DESCRIPTION | List Price | Discount Price |
| --- | --- | --- |
| Per site Rental of Venue to – Minimum Fee Charged to 3rd party | | $ 995.00 |

## Additional Transmission Services – Terrestrial

<u>Level3/Vyvx Video Fiber Services</u>

Upon request and subject to availability, CONTRACTOR will obtain video fiber services from Level3/Vyvx to backhaul the broadcast from the point of origin to the CONTRACTOR uplink facility.

**Additional Fiber Services available to CUSTOMER**

| DESCRIPTION | List Price | Discount Price |
|---|---|---|
| Mpeg2 Fiber (8 Meg) Between 2 Mpeg Cities | | $ 300.00 |
| Mpeg2 Hybrid Fiber (8 Meg) bet. 1 Mpeg/1 Non-Mpeg City | | $ 375.00 |
| Analog Basic Service Fiber (45 Meg) | | $ 575.00 |
| Switch Fees | | Cost plus 10% |
| Local Loop Charges | | Bid Only |
| 1st mile Fiber | | Bid Only |

NOTE: Taxes are <u>NOT</u> included and will be determined at the time of booking.  CUSTOMER may be responsible for payment of USF fees and/or any other applicable state/federal taxes. Please take this into account when budgeting for fiber costs.

EXHIBIT D

**Cancellation and Postponement Fees**

| - | Canceled after commencement of SOW but more than 30 days prior to Broadcast Event Date | Canceled By 5pm Eastern Time less than 30 days but more than 15 days prior to the Broadcast Event Date | Canceled By 5pm Eastern Time less than 15 days but more than prior to the Broadcast Event Date | Canceled by By 5pm Eastern Time less than 7 days prior to the Broadcast Event Date |
|---|---|---|---|---|
| **Cancellation fees for uplink** | 50 % of quoted uplink charge. If the Broadcast Event is postponed, Client will incur no charge | 75% of quoted uplink charge If the Broadcast Event is postponed, Client will incur no charge | 100% of quoted uplink charge. | 100% of quoted uplink charge. |
| **Cancel fees for permanent downlinks** | no charge | no charge | no charge | No charge as long as not more than 10% of the Broadcast Event's total permanent downlinks are canceled. If more than 10% of a Broadcast Event's total permanent downlinks are canceled, Client will be obligated to pay 100% of the total permanent downlink quote. |
| **Cancellation fees for temporary downlinks** | 50% | 75% | 100% of temporary downlink quote. | 100% of the temporary downlink quote. |
| **Survey charges for temporary downlinks** | Full charge ($250-$500) if work completed. No charge if work not completed. Supplier will provide documentation of completion. | Full charge ($250-$500) if work completed. No charge if work not completed. Supplier will provide documentation of completion. | Full charge ($250-$500) if work completed. No charge if work not completed. Supplier will provide documentation of completion. | Full charge ($250-$500) if work completed. No charge if work not completed. Supplier will provide documentation of completion. |

## EXISTING CLIENT RELATIONSHIPS

Takeda Pharmaceuticals North America

HealthStar

MedPoint Communications, Inc.

Lilly Pharmaceuticals

Sepracor

## SCHEDULE A

### EXISTING TECHNICIAN RELATIONSHIPS

AV Technicians used by GlobeCast:

Satellite Technicians used by Audio Visual Solutions, LLC:

## NON-COMPETITION AGREEMENT

**THIS AGREEMENT** (the "Agreement") is made on this ___ day of _____, 2008, by and between AV Solutions, LLC (the "Company"), a New Jersey limited liability company, having an office at 322 Route 46 West, Suite 260W, Parsippany, NJ 07054, and GlobeCast Enterprise Service - BTV Television ("GlobeCast"), having an office at 1193 West 2400 South, Suite "A", Salt Lake City, UT 84119  (generally the Company and GlobeCast will be referred to individually as a "Party" and together as the  "Parties").

**WHEREAS**, GlobeCast and the Company provide certain audio-visual and related services to a variety of companies;

**WHEREAS**, GlobeCast may be interested in installing and maintaining permanent satellites systems at restaurants and/or hospitality services companies which are actually or potentially engaged in a business relationship with the Company (and including any companies which are affiliated or under common ownership with such restaurants and/or hospitality services companies) (generally "Venues"); and

**WHEREAS**, the Company is willing to introduce GlobeCast to Venues for the purpose of having GlobeCast install permanent satellite systems at such Venues, provided that GlobeCast be subject to the restrictions contained in this Agreement;

**NOW, THEREFORE**, in consideration of the covenants set forth herein, and for other good and valuable legal consideration, the receipt and sufficiency of which is hereby acknowledged, GlobeCast hereby agrees as follows:

1.   **Introductions**.   Prior to the introduction by Company of any particular Venue to GlobeCast, Company will first disclose the identity of the Venue to GlobeCast.  If GlobeCast does not notify the Company within five (5) days of the disclosure of the identity of such Venue that GlobeCast has an existing relationship with such Venue, then such inaction shall be deemed an acknowledgement that communications with such Venue are to be subject to the prohibitions contained in this Agreement. This Agreement shall apply to all Venues introduced by Company to GlobeCast, including, but not limited to, those Venues listed on Schedule A annexed hereto, as such schedule may be updated and amended from time to time.  Failure to list a Venue on Schedule A shall not be determinative as to the application of this Agreement to such Venue.

2. **Covenants.**

(a)  GlobeCast shall not, without the express prior written consent of the Company: (i) install permanent satellites systems at any Venue introduced to it by the Company; (ii) approach or solicit any Venue introduced to it by the Company; (iii) interfere with, disrupt, alter or attempt to disrupt or alter the relationship, contractual or otherwise, between the Company and any Venue introduced to it by the Company; or (iv) in addition to the foregoing restrictions pertaining to Venues, solicit to provide or provide satellite systems or service relating thereto to any customer of Company (and including any companies that are affiliated or under common ownership with such customer) (generally a

"Customer") that Company has set forth on Schedule A hereto or that is subsequently identified in writing to GlobeCast as being a Customer of Company.  Failure to list a Customer on Schedule A shall not be determinative as to the application of this Agreement to such Customer.

Furthermore, GlobeCast agrees that until October 1, 2010, GlobeCast shall not, directly or indirectly, provide any products or services which competes with the services and products of Company, including installation services, satellite services, management services or any services related thereto, to any Morton's Steakhouse locations.  GlobeCast further agrees that in the event Company becomes a "preferred vendor" for any pharmaceutical company, then GlobeCast may not provide any products or services which competes with the services and products of Company, including installation services, satellite services, management services or any services related thereto, to such pharmaceutical company, unless GlobeCast can demonstrate that GlobeCast had a prior relationship with such pharmaceutical company prior to Company becoming a "preferred vendor".

(b)  In furtherance of the purposes set forth in the preambles to this Agreement, the Company will furnish GlobeCast with a list of the names and contact information of certain AV technicians and GlobeCast will furnish the Company with a list of the names and contact information of certain satellite technicians.  Each Party agrees that at all times during the term of this Agreement and for two (2) years following the expiration or termination of this Agreement, such Party will not, as a principal, agent, employee, employer, consultant, director or partner of any person, firm, corporation or business entity other than the other Party, or in any representative capacity whatsoever, directly or indirectly, without the express prior written consent of the other Party, approach, counsel or attempt to induce any of such other Party's technicians to leave such technician's employment or engagement by the other Party, or employ or engage or attempt to employ or engage any technician who at any time during the preceding twelve (12) months was employed or engaged by the other Party.  Notwithstanding the foregoing, this Agreement shall not apply to those technicians, set forth on Schedule B annexed hereto, with whom the respective Party has a relationship prior to being furnished with the list called for by this paragraph.

(c)  Neither Party shall attempt to circumvent this Agreement in any way or otherwise frustrate the purpose of this Agreement, including, without limitation, by aiding or counseling any other person, firm or business entity in doing any of the activities set forth in the previous paragraph.

(d)  GlobeCast agrees that any third party subcontractors it uses to provide any services at any Venue will become subject to the terms and conditions of this Agreement, and GlobeCast shall obtain from such third party an agreement that contains restrictions at least as restrictive as the terms and conditions contained herein, which agreement GlobeCast shall provide upon the request of Company.

**3.   Remedies.**  Each Party acknowledges that any breach of this Agreement will cause the other Party irreparable harm and both Parties agree that preliminary or permanent injunctive relief, without the necessity of posting a bond or other security, would be appropriate in the event of breach of this Agreement by such Party in addition to any other rights and remedies the other Party may have at law and equity.

**4.   Miscellaneous**

(a)  This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof.  It shall not be modified except by a written agreement dated subsequent to the date of this Agreement and signed by both Parties.  None of the provisions of this Agreement shall be deemed to have been waived by any act or acquiescence on the part of the Company, its agents, or employees, but only by an instrument in writing signed by an authorized officer of the Company.  No waiver of any provision of this Agreement shall constitute a waiver of any other provision(s) or of the same provision on another occasion.

(b)  Each Party hereto represents that the person signing on its behalf is authorized to enter into this Agreement and to bind said Party to the terms of this Agreement.

(c)  If either Party employs attorneys to enforce any rights arising out of or relating to this Agreement, the prevailing Party shall be entitled to recover reasonable attorneys' fees.

(d)  This Agreement shall be construed and controlled by the laws of the State of New Jersey, and both Parties further consent to jurisdiction by the state and federal courts sitting in the State of New Jersey.

(e)  Subject to the limitations set forth in this Agreement, this Agreement will inure to the benefit of and be binding upon the Parties, their successors and assigns.

(f)  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remaining provisions shall remain in full force and effect.

(g)  All obligations created by this Agreement shall survive change or termination of the Parties' business relationship.

(h)  All headings and captions contained in this Agreement are for convenience only and shall not affect the construction or interpretation of any provision herein.

(i)  This Agreement may be signed in counterparts, each and every one of which shall be deemed an original. Facsimile signatures shall be treated as original signatures.

5.   **Term**.  The terms and conditions of this Agreement shall remain in effect for the duration of any relationship the Parties and for five (5) years thereafter.

**IN WITNESS WHEREOF**, this Agreement is executed on the date first set forth above.

**GLOBECAST ENTERPRISE
SERVICE - BTV TELEVISION**

By: _____
Name

**AV SOLUTIONS, LLC**

By: _____, President
Name:

DMWEST #6602033 v1        36

## SCHEDULE A

### EXISTING OR POTENTIAL VENUES AND CUSTOMER RELATIONSHIPS

**Venues:**

Ruth Chris restaurants

Flemings Steakhouse restaurants

**Customers:**

Takeda Pharmaceuticals North America

HealthStar

MedPoint Communications, Inc.

Lilly Pharmaceuticals

Sepracor

Synapse

Vision to Voice

Pharmakon

CVT Pharmaceuticals

Boehringer Ingleheim

Pfizer

MediMedia

Advanstar

Daiichi Sankyo

Sanofi Aventis

Scientific Voice

Abbott